## ᵗ Hockenbury *against* Snyder.

If one having a good title finds another in possession of his land, who, under threats of a suit, agrees to accept a lease for the premises, he cannot afterwards, in an ejectment against him, devest himself of the relation of landlord and tenant; but if one having no right induces him in possession to accept a lease and become a tenant, the presumption is, it was by misrepresentation of fact or law, or both, and it will require but slight proof on this ground to dissolve the relation of landlord and tenant, and permit the defendant to avail himself of the merits of his title.

An assessment in his name, and payment of taxes, is not essential to the validity of the title of one who claims by the Statute of Limitations; it is but evidence of the fact of his claim, and the extent of it.

If a purchaser at a treasurer's sale knew when he purchased that the land was not unseated when the tax was assessed upon it, and he afterwards enters upon the land and makes improvements, upon a recovery against him in ejectment, he is not entitled to compensation for his improvements.

ERROR to the Common Pleas of *Butler* county.

This was an action of ejectment for 500 acres of land, by the heirs of John Hockenbury against Conrad Snyder and James Taylor.

The plaintiffs were admitted to be the heirs of John Hockenbury deceased, and as such claimed title to the land in dispute. The substance of the testimony on the part of the plaintiffs was, that John Hockenbury commenced an improvement on the tract of land in 1809, and left in 1811, when he leased the improvement to John Wigdon, who worked and occupied the fields on the shares in 1811 and 1812. Hockenbury returned in 1813, and remained on the tract till 1821, when he went to live with his son Joseph. He had grain in the ground at the time he left the land, and gave to George Dobson some loose boards as a compensation for his taking care of the grain and having an eye to it. Hockenbury returned to the place either in the fall of 1821, or spring of 1822.

There was, as to this part of the evidence, a good deal of contradiction and uncertainty in the testimony of the witnesses. According to the testimony of some of them, John Hockenbury left in the spring, returned in harvest, had the grain cut, and it was hauled to Joseph's in the winter, and returned to the place next spring, when M'Kimmons, who was in the possession under a lease from Brown and Snyder, went out and gave possession to him. Others proved that he was not more than six or seven months absent from the tract; and that he returned in the fall of 1821: that M'Kimmons went into possession in the fall, under Brown and Snyder, and gave up the possession the same fall to

Hockenbury. After Hockenbury returned to the tract, he remained on it till near the time of his death, which happened in 1839.

The defendants claimed title to the land by a purchase at treasurer's sale for arrears of taxes in 1818; for the county taxes of 1812, 1813, 1815, 1816, and 1817, and the road-taxes of 1812 and 1813, by Conrad Snyder and John Brown. Deed from John Gilchrist, treasurer, to Conrad Snyder and John Brown, dated 8th of June 1818. Also a deed from the same county treasurer to John Brown, for the same tract, dated 6th of July 1820, sold for the county and road-taxes of 1820. A deed from John Brown of Oliver to Conrad Snyder, for the undivided half of this tract, dated 18th of April 1823. That Brown, under the claim of title by the treasurer's deeds, leased this tract to John M'Kimmons, who, when Hockenbury went away, went into possession of the land, according to the testimony of some of the witnesses. Others proved that John Brown raised oats in one of the fields in 1821; and that M'Kimmons did not go on the tract until the spring of 1822, and remained but a short time on it, until he went away and Hockenbury took possession of the cabin.

Mr Brown proved, when John Hockenbury came on the land and M'Kimmons left it, that he said to him, that if they (Snyder and Brown) would let him stay, he would work on the roads as he had formerly done. Witness told him he might live there his lifetime. Afterwards heard that the old man talked of claiming the possession, and spoke to him about it. He then asked a lease for ten years. Witness was willing to give him a lease for that period. Snyder was not; said that five years was long enough. The lease was executed at the house of witness, and Mr. Meeker made Mr Hockenbury's mark by his directions. Said that his hand shook so much that he could not make his mark; then capable of attending to his business. Never discovered any alienation of mind. This witness proved that Mr Hockenbury went to live with his son Joseph. That he delivered the possession to him and assisted him to kindle a fire. Lemuel Davis proved that he leased a field from Brown and Snyder, raised on it a crop of corn, and put it in wheat. Old Mr Hockenbury knew of his occupying it.

The defendants gave in evidence the record of a judgment in the Court of Common Pleas of Butler county, Asxhell Shearman v. Eliza and John Brown, No. 53, July 1840. A *fieri facias* issued on this judgment, No. 64, April 1831, returned levied on the right and title of John Brown to lot No. 40, in the second donation district, 500 acres—Inquisition held and condemned—*Venditioni exponas*, No. 40, June 1831. 15th of June 1831, sold to William Ayres. Deed, Jacob Brinker, Esq. sheriff, to William Ayres, Esq. Deed from William Ayres, Esq., to Conrad Snyder. A deed from John Brown (of Oliver) and Conrad Snyder to Henry Peters for 139 acres and allowance, dated 26th of October

[Hockenbury v. Snyder.]

1829; re-conveyed by Henry Peters to Conrad Snyder, 17th of September 1835. Deed from Conrad Snyder to Hugh Smart, dated 19th of September 1835, for the whole tract. Deed from Hugh Smart to Conrad Snyder, dated 10th of September 1836, for the same tract of land.

The defendants also claimed the land in dispute by title derived from the heirs of Captain Stevenson, who drew the tract in dispute; and gave in evidence a certified extract from the general draft of the second donation district; showing that lot No. 40, of 500 acres, second donation district, was drawn by Captain Stevenson. A power of attorney from Miss E. Stevenson and Adam Livingston and Mary his wife to the Rev. D. Elliott, dated 6th of November 1837, authorizing and empowering him to sell and convey the tract of land in controversy. Deed, Eliza Stevenson, Adam Livingston and Mary his wife, by their attorney in fact, to Conrad Snyder, dated 17th of March 1838, for the same tract, consideration $350; and the depositions of James Ross, Anthony Berlen, Rev. David Elliott, and Mrs. Ann Elliott, proving that Captain Stevenson was a revolutionary officer, and that Mrs. E. Stevenson and Mrs. Mary Ann Livingston were his daughters and heirs.

The defendants also gave in evidence a lease from John Brown (of Oliver) and Conrad Snyder to John Hockenbury, dated 5th of October 1830, leasing to him the tract of land in dispute for five years. Also, the record of an action of ejectment, Conrad Snyder v. John Hockenbury and others, for the lot No. 40; tried by a jury, 12th of March 1839, and verdict for plaintiff and judgment on that verdict.

The plaintiff called and examined a number of witnesses to prove that John Hockenbury was weak and imbecile in mind, frail and incapable of attending to business; and the substance of their testimony was, that to one he spoke of going out with his dogs and catching raccoons, and of farming largely; and to another, that if it were not for the rheumatic pains, he could yet raise as much as his son Jonathan; attempting to mow and mowing some grass, and speaking of going to the furnace to chop and cord wood; and when the witness, John Mortland, said to him that he was too old to chop wood, replied he could chop well. Witness would not then have given him his board for his work. This witness and James Hoge proved that in 1836, when engaged in making a survey of this tract of land, in looking for the northeast corner, some of them spoke of going for old Mr Hockenbury —that he knew where it was; and that Conrad Snyder said it was of no use to go to the old man, for if he ever knew anything about the corner, he did not now, as he was doting. James Clark, one of the assessors of 1834, proved that he went on the place. Found old Mr Hockenbury and his son Jonathan. Told us to assess it to Conrad Snyder. That they assessed the lands

[Hockenbury v. Snyder.]

to the persons that they found on the tract, unless otherwise directed by them. Daniel Foster, another of the assessors, stated that Clark said that old John Hockenbury complained of no assessor going near him; and that we must go there. Went there, and told our errand. Asked if he claimed the land. Said he would hold the land, if not prevented by a lease that Brown induced him to take. Asked if we would assess it to him. Said we might use our pleasure; if he could not resist the lease, Snyder would hold the land; and if he could resist the lease, he would pay the taxes. Jonathan said that his father had been ill-used, and he would see him righted. If he had insisted on its being assessed to him, we would have done it.

The court below thus instructed the jury:

The sales for arrears of taxes and the treasurer's deeds given in evidence, it appearing by the evidence that John Hockenbury was on the tract and improving it in 1809, and that it was occupied and seated during the year for which it was assessed and sold as unseated, vest no title to the tract in controversy in the defendants; and as far as regards title, the case need not have been encumbered by their being given in evidence, unless for the purpose of showing a colourable title, and the right of entering upon the tract and making improvements. The plaintiffs in this case contend that the evidence establishes that John Hockenbury has been in the continued and undisturbed possession of the tract of land in controversy from 1809 until the recovery against him in a former ejectment in 1839, a period exceeding 21 years, and have a title under the Statute of Limitations, that entitles them to recover. The law, as now settled by our Supreme Court, is, that where a person enters upon a warranted or patented tract of land, with or without colour of title, and is in the peaceable, continued, undisturbed, adverse possession of it for 21 years, claiming by the lines of the tract, and paying the taxes and using the wood and uninclosed land in the usual and ordinary manner in which the owner of a tract of land uses it, a jury may presume an ouster of the owner, and the person thus in possession has a title by the Statute of Limitations that will protect him in his possession, or enable him to recover, if out of possession, on the title thus acquired by the Statute of Limitations. This, as I understand the recent decisions, is the greatest length to which any of them have gone. And before an ouster can be presumed there must be the payment of taxes. In the present case it appears by the evidence that John Hockenbury, under whom the plaintiffs claim, during the whole of the time that he lived on this tract, or occupied it, never paid any taxes, nor was it assessed to him; and if he intended to claim the whole tract, it was his duty to have it assessed to himself. It is also in evidence, if believed, that Davis occupied one of the fields for two years, and raised a crop of corn and a crop of wheat; and that Brown raised a crop of oats in

1821, in one of the fields. That Peters, under a purchase from Brown and Snyder, went into possession of 139 acres of the tract in 1829, made considerable improvement, and lived there for several years, and that M'Kimmons was in posssesion under a lease from Brown and Snyder, for a short time either in 1821 or 1822. Under this evidence and these circumstances, if believed, it is clear that the plaintiffs would not be entitled to recover the whole tract, if any portion of it, by title acquired by the Statute of Limitations.

It is contended that the lease taken from John Hockenbury was obtained and procured by fraudulent representations, and is therefore void; and that John Hockenbury, at the time he entered into the contract and took the lease, was so imbecile and destitute of capacity to make any contract or attend to or manage his business, as to render it invalid. Fraud vitiates every contract that is tainted with it; and if there is evidence to satisfy the jury that John Hockenbury was induced to take the lease by misrepresentation, or undue or improper means, it would be of no validity and would not affect his possession; but if fairly obtained and entered into, would break the continuity of the adverse possession. If the jury were satisfied from the evidence that John Hockenbury at the time of taking the lease, was incapable of making a contract by reason of alienation of mind, the lease would be invalid, and have no effect on the possession of Hockenbury. The burthen of proof as to imbecility and incapacity of mind in John Hockenbury at the time of taking the lease is thrown on the plaintiffs: and it was for them to make it appear by evidence.

The treasurer's deeds, although vesting no title to the land, yet were such a title as Brown and Snyder, if they entered on the land in pursuance of such title and made improvements, could not be recovered of them by the original owner, until the value of the improvements made by them, or those claiming under them, were paid; and were such a title as they might give a lease of the land, without rendering that lease fraudulent from the mere circumstance that their tax-titles on an investigation or trial in court were defective and invalid, as to the vesting the title to the land in them. If the jury believe from the evidence that in 1821 Brown was in possession and raised oats; that Lemuel Davis occupied one of the fields for two seasons, and that John Hockenbury delivered the possession to Brown in 1821, there would not be a continued, undisturbed, peaceable, adverse possession for 21 years of any part of the tract; and your verdict would be for the defendants.

If you do not believe this evidence, but believe that John Hockenbury was in the continued and uninterrupted peaceable adverse possession for 21 years, then your verdict will be for the plaintiff for so much of the tract as has been enclosed and occupied by him for 21 years.

[Hockenbury v. Snyder.]

We have been requested by the plaintiffs to charge you on the following points:

1. That if the jury believe that John Brown and Conrad Snyder, or either of them, procured the lease from Hockenbury for the purpose of strengthening their defective treasurer's title, it would not amount to an interruption of Hockenbury's possession.

2. That if the jury believe the declarations of Conrad Snyder, and the testimony of plaintiff's witnesses, that John Hockenbury was doting—that he was not in a fit state of mind to make any contract, on that ground alone the lease and contracts with John Brown would not amount to an interruption of Hockenbury's possession.

3. That John Brown having proved that he told Hockenbury that their title was good, and that they gave him notice that they would try the title, and it turning out that said representation was untrue, any contract or lease or possession made under the influence of such misrepresentations would be void, and would not interrupt Hockenbury's possession.

4. That if the jury believe that John Hockenbury settled upon and claimed the whole 500 acres of land in dispute, and was willing to have it assessed to him, but that the assessor refused to call upon him for that purpose, either through the representations of Brown that he was the owner, or through a neglect of duty, it was not the duty of Hockenbury to go to the assessors, and he is not to be prejudiced by their neglect.

5. That an attornment to one who has no title is no interruption of an adverse possession, and that the treasurer's title being bad, Brown and Snyder had no title, and the attornment to them would not interrupt the adverse possession.

6. That if Hockenbury was holding an adverse and peaceable possession of the tract, and claimed to the old lines of the survey for 21 years, his possession and improvement of a part would not only put him in possession of the part thus claimed, but would put him in possession of the whole, and would entitle his heirs in this case to a verdict for the whole tract.

Answer to first point. If the lease was fraudulently procured for the purpose of strengthening their defective treasurer's title, or for any other purpose, it would be invalid, and would not interrupt the possession of Hockenbury.

Answer to the second point. The declarations of Conrad Snyder in 1836 that Hockenbury was doting, would not in itself be sufficient to prove that in 1830, the time when the lease was taken and executed, he was not in a fit state of mind to make a contract. The state of Hockenbury's mind at the time of entering into the lease is the point of inquiry to which the jury is particularly to direct their attention; and unless there was evidence of insanity or incapacity of mind established by the evidence before that time, the burthen of proof rests on the plaintiffs. If from mental aberra-

II.—V*

tions he was incapable of attending to business or making contracts at the date of the lease, it would be invalid.

Answer to the third point. That John Brown telling John Hockenbury that they had a treasurer's title, and that he believed it was good, and giving Hockenbury notice that they would try their title, would not be such a misrepresentation as would render a lease taken of them fraudulent, although their treasurer's title turned out to be defective; unless he was aware of the defect at the time he spoke of their title.

We answer the fourth point *in the affirmative.*

Answer to the fifth point. The treasurer's deeds, although they did not vest a good title, yet were such a colourable title, that the defendants, if they entered on the tract, would be entitled to the value of improvements made by them under their tax-title. If the lease was fairly entered into, the attornment would interrupt the possession.

Answer to the sixth point. If the possession was adverse, continued and uninterrupted for 21 years, claiming by the lines of the tract, and he had done all that could be reasonably done by him to have it assessed to him, it would, by the Statute of Limitations, give a title that would entitle the plaintiffs to recover. In this case, his having paid no taxes—it being twice advertised and sold for taxes while he was on the tract—his being aware of the sale to Peters, and Peters' living on it for a number of years—Brown occupying one of the fields and leasing to M'Kimmons—Davis occupying another field for two years, if believed by the jury, negative his claiming the whole tract, or claiming by the lines of the tract. The law on this evidence would not presume an ouster of the original owner, and the operation of the Statute of Limitations would be confined to the land actually enclosed and occupied adversely for 21 years.

Errors assigned:

1. In charging the jury that the treasurer's deeds, (although the land was not unseated,) were good so far as to entitle the defendants to compensation for improvements made under them, and that being colourable the attornment made to Brown was good.

2. In charging that the payment of taxes was necessary to constitute a title under the Statute of Limitations.

3. In charging that it was the duty of Hockenbury to have the land assessed in his name, and that the failure to do so prevented the statute from running in his favour.

*Purviance,* for plaintiff in error, argued that the proof was clear that the land was not unseated, and therefore the treasurer's sale was absolutely void; and being so, the defendants could acquire no right to compensation for improvements: nor was it colourable so as to justify the defendants in claiming possession of the land, and executing a lease to the plaintiffs' ancestor.

[Hockenbury v. Snyder.]

The assessment and payment of taxes have never been held to be essential to the validity of a claim under the Statute of Limitations; the utmost that can be claimed for it is, that it is evidence of the claim of title. It is not the duty of a resident settler upon land to go and seek the assessor; it is sufficient that he resides upon, and thereby makes himself liable for the payment of taxes when called upon.

*Sullivan, contra.* Whether a defendant, who claims title under a treasurer's sale, be entitled to compensation for improvements, must depend upon the question whether those improvements were made *bonâ fide.* His purchase is upon the faith of the representations of public officers acting under the obligation of an oath, which is very strong evidence of the truth, more so than the purchaser could obtain elsewhere, even by an inspection of the land, ten, fifteen, or twenty years after the tax was assessed. The proof was that Hockenbury directed the assessor at one time to assess the land in the name of the defendants.

The opinion of the Court was delivered by

Huston, J.—This case presented a variety and complication of facts, on which many questions arose. Certain lands were appropriated by law for the officers and soldiers who served during the war of the revolution. These lands were surveyed by the state in ranges from east to west, and the surveys in each range were numbered. A Captain Stephen Stevenson drew No. 40 in the second donation district, 500 acres. By law, no taxes were to be assessed by the state on these tracts during the life of the soldier or officer, unless he sold his right; and then they were in the hands of an alienee taxed as other lands. The state did not grant warrants for these lands to persons applying and offering to pay for them, nor were they open to actual settlement so that any person sitting down on and building, clearing, cultivating, and continuing his residence, could acquire a right to a warrant from the state. They were expressly reserved in the Act of 3d April 1792, having been before appropriated to the above use by the state.

It appeared that John Hockenbury (father of the plaintiffs) was living on this tract of land in 1809, and continued there until 1811 or '12, when he leased it to John Wigdon a year or more; and in 1813, Hockenbury returned and continued residing there until 1821, without interruption. In the mean time, it was sold as unseated land for taxes in 1818, viz. county taxes for the years 1812, '13, '14, '15, '16, '17; and road taxes for 1812 '13; and purchased by Conrad Snyder and John Brown, to whom the treasurer made and acknowledged a deed. The defendants also showed another deed from the treasurer of the county to John Brown, dated 6th July 1820, for taxes, county and road. On the 18th April 1823,

John Brown sold one-half (under his last deed, I suppose,) to Conrad Snyder. About the year 1821, John Hockenbury went to live at his son Joseph's, leaving grain growing on the land, and agreed with a George Dobson to take care of it. At this point the witnesses differed as to dates and times, some saying Hockenbury went in the spring of 1821, and returned before harvest; and others that he went in the summer of 1821, and returned in the spring of 1822. In the mean time Brown and Snyder leased to one M'Kimmons, who moved on to the land, but left it and let Hockenbury into possession when he came back; others say that Brown put a crop of oats in one of the fields in 1821, and that M'Kimmons did not go on till the spring of 1822, and stayed only a short time till he gave up the possession to Hockenbury. All agreed that after this Hockenbury resided in his house and improvement until he died in 1839; but it was proved that a certain Lemuel Davis rented a field from Brown and Snyder, and raised a crop of corn on it, and then a crop of wheat; that Hockenbury knew this, and did not object. It was also shown that on 26th October 1829, Brown and Snyder sold 139 acres to Henry Peters, who lived on it till he reconveyed to Snyder on the 17th September 1835; and on 19th September 1835, Conrad Snyder conveyed the whole 500 acres to Hugh Smart; and on 10th September 1836, Hugh Smart conveyed the same to Conrad Snyder. On 17th March 1838, the heirs of Captain Stevenson conveyed their right to Conrad Snyder for the consideration of $350. In 1831 the interest of Brown had been sold under a judgment and execution against him, and bought for and conveyed to Snyder.

On the trial, Brown was examined, and proved that he was present when his tenant, M'Kimmons, gave up the possession in 1821–2, to Hockenbury. That the fire was carried out and kindled again in Brown's name. That Hockenbury promised to work on the roads for the tax, if Brown and Snyder would let him stay there during his life. That he afterwards heard Hockenbury talked of claiming, and went to him. Hockenbury asked a lease for ten years; Snyder objected, but they gave him a lease for five years. That Meeker, who was present, made Hockenbury's mark to the lease, because his hand shook so he could not make it himself. This was in 1830, but no month or day is given; so it is stated that Hockenbury was on in 1809, but not said at what time of the year. It may be that Hockenbury had been on the land more than 21 years when this lease was made; or perhaps a little less than 21. Neither the whole tract, nor any part of it, appears to have been ever assessed to John Hockenbury. In 1834, when the assessor called on him, he said he would have it assessed to him, and pay the taxes, if he could get clear of his lease to Snyder, From this we infer it was taxed to Snyder, but when first, or how often it was assessed to Brown and Snyder, or to Snyder alone, does not appear.

[Hockenbury v. Snyder.]

The court very properly told the jury that the sale by the treasurer for taxes, where the land was seated, and had been for eight or nine years, and during all the years for which the tax was alleged to be due, was void, and gave no title to the purchaser. The whole of the laws authorizing sale of land for taxes, speak of and suppose the land to be unseated. The commissioners have no colour of right to order the treasurer to sell, and the treasurer has no colour of authority to sell a tract of land for taxes, on which a person resided when the tax was assessed and fell due, and on which he continued to reside at the time of the sale. If Brown lived in the immediate vicinity, and knew when they bought it that it was a settled tract, it makes the matter no better on his part.

The next question was, as to the effect of the removal by Hockenbury; the entry and occupation by Brown of a field; the lease to M'Kimmons; the return of Hockenbury, and the lease he took for five years. When a man having good right to land finds another on it for less than 21 years, the owner has a right to the possession, can recover it by ejectment, may threaten an ejectment and costs, unless he in possession signs a lease. If under such circumstances, he in possession signs a lease and becomes tenant, it must be a rare case in which he can get clear of the relation of tenant, or resist the right of his landlord. But when a man is in the peaceable occupation of surveyed land, his possession is a right against all but the owner of a title to that land. If one who has no right comes and induces him in possession to become his tenant, it must be by some misrepresentation of fact or law, or both, or by some unfair combination between him and the tenant; and it will require little proof of fraud or threats of imbecility on one side, and some undue influence on the other, to dissolve this relation of landlord and tenant between them, and put him who was in possession into precisely the situation in which he was before he was induced to sign a lease. *Hall* v. *Benner,* (1 *Penn. Rep.* 402); 10 *Watts* 142.

I have alluded to the defect of dates. If John Hockenbury entered on this land in the spring of 1809, then 21 years had expired in the spring of 1830; and if after this, and after his right had become perfect to at least some land (and I shall speak of how much hereafter), he was induced to take a lease from, and become a tenant to those who had no title, this must have occurred from misrepresentation, fraud, or mistake; and slight evidence of imbecility, or weakness, or of poverty, worked on by threats, would be sufficient to avoid it. The law, as far as it went, was correctly stated by the Judge; but he did not advert to the palpable difference between a lease taken by one who had a naked possession, from the owner of the land, who could evict him, and a lease taken from one who had no *scintilla* of right, and who could in no way have recovered from one in possession.

II. — 32

[Hockenbury v. Snyder.]

But though the parties are the same, their rights have become different. Snyder and his tenant now appear in court as purchasers from and clothed with the right of Captain Stevenson's heirs; and the heirs of Hockenbury claim the tract by virtue of a settlement, and, as they allege, an adverse possession, for more than 21 years. Every case says the possession must be adverse, and continue so. Among the last cases are *Sorber* v. *Willing,* (10 *Watts* 141); *Phillips* v. *Gregg,* (10 *Watts* 164). If a settler is ousted by a wrong-doer forcibly, and on bringing indictment for forcible entry and detainer, is, as soon as the case can be decided, restored to the possession, I should say his subsequent possession was connected with and a continuance of his former possession; and such would generally be the case, if his possession was broken by fraud; at least the person guilty of the fraud, if found by a jury, would not derive any advantage from it. There may, however, possibly be cases in which long acquiescence, and intervention of third persons, might make a difference as to those persons; as in this case the sale of part of the tract to Peters, and Hockenbury seeing him buy and live on the part six years, may be evidence to show that Hockenbury either never claimed that part, or if he did, lost it by acquiescing in a possession inconsistent with his claim.

What was asked from the court about payment for improvements, if the plaintiffs recover, and what was said by the court, seems to me to arise from an inaccurate view of the parties, and facts of the case. By the Act of Assembly, if the warrant owner recovers from a purchaser at a sale for taxes, in certain cases, he must pay for improvements. But here the warrant owner and purchaser at the tax sale, are now the same person, and are contending whether the grantee from the state, or a settler on his land, have the best right to the possession. In such case the law knows nothing of paying for improvements.

I come now to the principal error relied on. The Judge says he understands the Supreme Court to have decided, " that where a person enters upon a warranted or patented tract of land, with or without colour of title, and is in the peaceable, continued, undisturbed, adverse possession of it for 21 years, claiming by the lines of the tract, and paying the taxes, and using the wood and unenclosed land in the usual and ordinary manner in which the owner of a tract of land uses it, a jury may presume an ouster of the owner; and the person thus in possession has a title by the Statute of Limitations that will protect him in his possession, or enable him to recover, if out of possession, on the title thus acquired by the Statute of Limitations. This, as I understand the recent decisions, is the greatest length to which the court has gone. *There must be a payment of taxes* before *an ouster can be presumed.*" He then goes on to say that during the whole time Hockenbury lived on the land he never paid any taxes, nor were they assessed to him;

and if he intended to claim the whole tract, it was his duty to have it assessed to himself. This point is adverted to twice again, and in such a manner that I am not sure I exactly comprehend the meaning of the Judge. I proceed to give my views of adverse possession, and of the nature and extent of it with us. At least a century ago it was understood that if a man sat down on and improved and continued to reside on land, never before granted or appropriated by the proprietors, or since by the state, he acquired some inception of title, such as that the state or proprietary could not sell it to another. As early as 1774, B. Chew, then Chief Justice, said this usage was so general, and of so long standing, that a chancellor would compel a grant to the settler on his tendering the stated price, with interest from the time of his settlement. See the opinion of Yeates, J., *Bonnet* v. *Devebaugh,* (3 *Binn.* 175). After some interruption by the war, this doctrine has become settled and well understood. The state may call on the settler to take his warrant and pay the purchase money. Many laws have been passed, extending the time within which lands must be patented, and warrants taken out by actual settlers. If land was vacant, any man had a right to settle on it; and by such settlement he might hold, since 1784, 400 acres, or any less quantity. If at his settlement, or before any intervening right, he designated his boundaries, not exceeding 400 acres in a reasonable shape, no one could take from him; but if he designated no boundaries, but suffered without objection others to settle near and around him, he could not remove them after they had spent labour and money, although less than 400 acres was left for him. If, when the whole country was covering with warrants, a surveyor came, he was bound to leave him, beside his clearing, a reasonable quantity of wood-land. *Barton* v. *Glasgo,* (12 *Serg. & Rawle* 149). But men have settled on appropriated lands, and this under different circumstances; generally, perhaps always, under the idea that the land was vacant, and that by settlement a right to it could be acquired. If the land was vacant, this idea was correct; so warrants have been taken for and surveyed on land before appropriated, under the same mistake. A warrant paid for, and a settlement made on the same day, on appropriated land, would be equally defective; neither would give any title until actual possession for 21 years barred the right of the former owner; yet it has been uniformly held, the owner of such younger warrant had colour of title, and after 21 years was protected to the extent of his lines. An actual settler in the woods has just as much colour of title, and as much title, if the land is vacant, as one who takes a warrant for the adjoining land; if vacant, both have title; if appropriated, neither have until 21 years' actual continued possession under a claim bars the old title. The settler does not always mark his boundaries as his neighbour who has taken a warrant does; but if he designates them by known natural or

[Hockenbury v. Snyder.]

artificial boundaries, it does as well. It is not the warrant nor the survey of his neighbour which gives right to previously appropriated land; nothing but length of possession will do it; and it does it as fully and effectually for the settler without as with a warrant. There may be, and often is this difference: the extent of the settler's claim is not so well defined as that of the warrantee, as I have before said; hence, a difficulty as to the extent of the settler's right in some cases. He cannot obtain, if the land was vacant as he supposed, more than 400 acres; but he may take less—300, or 200, or 100—if he has marked no lines, nor in any other way designated his claim. The assessment is resorted to, not as giving him a right, but to show the extent of his claim and possession; if he has uniformly returned for taxation only 100 or 200 acres, he cannot, after 21 years' possession, extend it to 300 or 400 acres. Procuring himself to be assessed for a tract of land to which he can show no title, and of which he has not been in possession, and paying the taxes for 21 years, will not give title either to plaintiff or defendant. *Sorber* v. *Willing*, (10 *Watts* 141). I apprehend then that, where paying taxes for a tract, or the whole tract, is spoken of, it has reference to the extent of the claim, and is referred to as evidence of that extent, and not as being that without which the Statute of Limitations cannot operate. This is, in this respect, a singular case; and the jury will consider whether the omission to assess Hockenbury was or was not part of a plan to obtain his land without legal and regular means.

I do not know that every or any judge has arrived at the conclusion stated in *Criswell* v. *Altemus* by the same reasoning I have; but if I am right, a settler on appropriated land can acquire right and protection to no more than he could if it was vacant, *i. e.* to 400 acres. If, then, a settler goes, as in this case, on a 500 acre tract, or, as in much of the state, on a 1000 acre tract, without pretence of a purchase of the legal title, he cannot after 21 years' occupation hold more than 400 acres; being what he could have held if he had settled on vacant land; but in order to hold this, he must show in some way that his claim and constructive possession embraced so much. There is difficulty in this case on every side; there is no proof of the extent or amount of Hockenbury's claim: but more; a portion of his clearing was not on the Stevenson tract, and as I understand, it began early and occupied till his death. If he ever designated any bounds of his claim, how much of such bounds lay within, and how much lay out of the Stevenson tract? This a jury will ascertain as best they can. This court can only say he cannot hold, after 21 years' possession, more of the Stevenson survey than he claimed before the 21 years had run round. If he never, until after 21 years' occupation, designated any extent of his claim; if at all times a portion of land he occupied and claimed was not within the Stevenson survey, then he or his heirs cannot hold 400 acres of it. I would not, however, confine him

[Hockenbury v. Snyder.]

strictly to his fenced and cultivated land. In this western country, some wood-land is considered essential to a farm, and, to a certain extent, is so. How much beyond the fences a jury will give, if they should find for the plaintiffs below, will be for their serious consideration on all the facts and circumstances of the case.

The judge stated, among other things, that the treasurer's deed to Brown and Snyder was, or might be, a colourable title which would justify them in entering on the land and making improvements. If they, at the time they purchased, knew (and it seems they did know) that Hockenbury lived, and had for many years lived on this tract, they would come within the decision in *Miller* v. *Keene*, and would not be entitled to compensation for improvements if they had made any. The case of a treasurer's sale of a settled plantation, for taxes, is unknown to our laws—it cannot be—there is no authority for it—it is void, not voidable—it gives the purchaser neither title nor colour of title. I speak of a case in which the purchaser knew it was seated land, or where, on going to it after his purchase, he finds a person living on it, and sees by the extent and appearance of cultivation that he has resided there many years; if after this he enters or expends money or labour, he is without excuse, and ought to be without compensation.

The majority of this court have overruled at this term a long series of decisions from *Creigh* v. *Wilson* to this time. I would not have done so; it is impossible to foresee the full effect of it; I would have affirmed the case of *Miller* v. *Keene*, and if necessary, left the matter to legislative interference.

Judgment reversed, and a *venire de novo* awarded.