## SAILOR *v.* HERTZOGG.

Where possession, under colour of title, was shown to have been in A. until his death, and there was evidence of possession of the premises by B., one of his sons, after A.'s death: a conveyance to C., another of A.'s sons, by his executors, is admissible for defendants in possession, claiming through such conveyance as evidence of the claim of right, in which the possession was held by the family of A., and of the hostile character of that possession to a better title, then subsisting in third persons.

Where there is a paper title to land, regular with the exception of one conveyance, and written acts of ownership by parties claiming under the title, and the possession was shown to have accompanied such title for a series of years, excepting an occasional vacancy during a pestilence, and an occasional occupancy by persons who were not of the family of the claimants, the assessment books are evidence for the purpose of showing the continuity of claim and possession during such supposed interruptions of the occupancy: and this, though the assessments were sometimes made in the name of the executor, and sometimes in the name of one of the sons of the claimant, such son not being a party to the conveyances of the title.

To prove actual possession of the house in question by E., who held under a conveyance from W. in February, 1789, and who had conveyed the property in the same month, the record of an amicable *sci. fa.* is evidence, in which the writ was tested, September, 1790, June T. 1789, and was filed in 1794, and which was intended to revive a judgment recovered against W. in 1786, to bind land which he had aliened to E. in 1789—the recorder's certificate showing that no deed, was of record between 1787 and 1790, purporting to convey property from W. to E., but the deed in February, 1789, for the property now in question.

The expression of an opinion by the judge as to the weight or credibility of the evidence, is not the subject of a writ of error, unless it be delivered as binding upon the jury.

CERTIFICATE from the Nisi Prius.

*April* 20–23.  This was an ejectment for a house and lot, situated in the city of Philadelphia.  The title to the property was originally in Henderson.  In June, 1788, Henderson conveyed to Weiss.  On the 5th of July, 1788, Weiss conveyed to Jacob Sailor.  This deed was acknowledged January 12, and recorded May 27, 1789.  In 1817, Jacob Sailor conveyed to Henry Sailor, the plaintiff below and in error.

.  The defendant gave in evidence the title-deeds for the property, prior to the ownership by Henderson, and a re-conveyance by Weiss, his grantee, to Henderson, dated January 19, 1789, recorded November 29, 1789.  On the 2d of February, 1789, Henderson conveyed to Etwein, and he conveyed to John Peters, February 16, 1789.  John Peters' will was proved in 1793.  In 1800 Peters' executors conveyed to his son Joseph Peters.  This and the subsequent deeds were objected to, because the will contained no power to make the conveyance.  The will was not on the record.  Joseph Peters conveyed to Daniel Ley in 1809, and he conveyed to Hupfeldt, *et al.*, in 1818.  In 1818 they conveyed to Hertzogg, the defendant.  Hertzogg conveyed to Guyer in 1827, who was substituted as defendant, after the death of Hertzogg, in this action, which was brought in 1831.  The defendant also gave in evidence two mortgages by Daniel Ley, in 1809 and 1816, on which satisfaction had been entered.  To prove adverse possession, the defendant called a number of witnesses.  Patterson stated, that from 1802, the house was occupied by Ley, or Ley and Hupfeldt, until 1818.  The next occupant was Hertzogg, in 1822.  Greiner said, that John Peters was in possession in 1794 or 1795, and was succeeded by his son Jacob, who carried on business there until his death in 1793, shortly after which, Ley became the purchaser.  In 1793, before Jacob Peters died, he thought the house was vacant.  The boys pelted it as a haunted house.  He also thought it was vacant after Jacob Peters' death, until Ley occupied it.  Pennington proved the occupation of the premises by Ley, in 1800 or 1801.  Maybin proved the possession by John Peters in 1793, and said the property remained in their possession until sold by the executors to Joseph Peters.  The business was conducted by George Peters, the active executor. He understood George rented it to Ley; he did not know of a tenancy existing, but judged so, because Ley was in possession before he purchased.  The defendant then gave in evidence the assessment books, which his honour admitted as evidence of claim

—but not in themselves evidence of adverse possession. These assessments were:—1791, Jacob Peters (baker); 1793, Ib.; 1794, Ib. (estate); 1795–6–7, in the names of Stammers and Cooper, for Jacob Peters' estate; 1798 to 1801, George Peters' estate; 1802 to 1807, Ley, and Ley and Hupfeldt, for George Peters' estate; 1808–9, for Joseph Peters' estate; 1810 to 1818, Daniel Ley's estate; 1820 to 1827, Peter Hertzogg's estate, and P. Hertzogg & Co.'s estate; 1828 to 1831, George S. Guyer's estate. Fraley stated, he knew the premises, occupied by old Mr. Sager as a bake-house, in 1784. The next baker was Jacob Peters, who occupied until his death in 1793. In 1793 the yellow fever was in the city, and all who were able left it. It visited the city in 1797, and again in 1798, when every one fled that could. The defendant then, under exception, gave in evidence the record of Murgatroyd v. Etwein, and the certificate of the recorder of deeds. This record was an amicable *sci. fa.* in the Common Pleas, to revive a judgment recovered against George Weiss in 1786, so as to bind certain land, of which he had become seised, since the rendition of the judgment, and had aliened to Etwein. The writ was tested September 9, 1790, of June T. 1789, and was filed in 1794; a rule to plead was entered in 1790, and the continuances from term to term entered until 1792, when the cause was removed to the Supreme Court by *certiorari*. The recorder's certificate, dated 1847, stated that the only recorded conveyance to Jacob Etwein, between the 25th of February, 1787, and July 1, 1790, was that from Henderson, for the property now in question, dated February 2, 1789.

The plaintiff then called Catherine Craghan, who was his sister. She stated that she knew her husband received rent for the property, for Jacob Sailor; the year before 1798, was the last time he received the rent. He received it two or three years. He ceased doing so in 1797, on account of the sickness. After that was over, they went to look after the property, and found strangers in it, and then sent for Jacob, who lived in the country, to come down. He came, and found strangers in possession. In 1815, Jacob gave Mr. Young a power of attorney to look after his property. Young found Ley in possession, and told him he must do something about the property; he must pay rent or buy it; if not, he would enter suit. Ley said, "I will not pay any money to anybody, for I find the property is Jacob Sailor's; I hope you won't distress me; send to Jacob Sailor, and I will buy it of him, or compromise it with him, for I find there is no other title than

Jacob Sailor's, and I will pay no more money to Peterman." Ley brought all his papers down, and showed them to Young, and said he would come on terms and settle with him, for there was no other title but Jacob's. The witness further said, the property was vacant during the fever; the tenants left it on that account, and did not return. Strangers to them next occupied it. The plaintiff further read the deposition of this witness, taken in 1825. In this, the testimony respecting Ley's assertions of his want of title, was the same in substance as that already stated, but the offers to purchase, &c., were not mentioned. In a deposition taken in 1827, which was also read by the plaintiff, the witness stated that her brother received rent for the property once after the yellow fever prevailed, and that once was in 1794. She also then stated that, at the interview with Ley, in 1815, he said he would pay no more money, because Jacob Sailor's title was clear, and he would send for him, and try and compromise, if he could. On cross-examination, she said she thought her husband received the last rent since 1795. The plaintiff also read the evidence of Kolback, who proved conversations between Ley and Sailor in 1807, and subsequent years. During these, Ley admitted that Sailor's title was the better one, but his offers to purchase, as stated by this witness, were clearly by way of compromise. This witness's character for truth was impeached by numerous witnesses. The plaintiff then called Young, who stated that in 1815, Sailor requested him to call on Ley and and see what compromise could be made. Young called there, having a power of attorney to compromise or bring suit. Ley told him he had purchased the property of Peterman, and paid part of the price. He showed Ley the deed to Sailor, and told him something must be done, or he would be obliged to bring suit; he did not wish to distress him, but was willing to compromise on the most amicable terms. Ley looked over the deed and papers for an hour, and said he believed Sailor had the right and title to the property, and he would pay no more money to Peterman. Young asked him on what terms he was willing to come on or compromise. He said either to pay rent or purchase from Sailor, provided he would sell it to him right. Ley desired to see Sailor, and Young sent for him, and he called on Ley, taking the copy of the deed. Sailor and Ley then met at a tavern by appointment, and talked about the property. Ley made an offer, but Sailor required more. Shortly afterwards, Young called on Ley, and inquired how he and Sailor got on. Ley said they were like to come to a compromise; he had offered

$2,500. The witness further stated that in the last conversation, the last words that Ley said were, he was willing either to purchase or to pay rent to Sailor.

In a deposition taken in 1826, this witness had said that he had called on Ley in 1815, about this property. Ley stated he believed Sailor had the oldest title; that Ley and Sailor had an interview afterwards, but the witness could not recollect what took place.

The charge of his honour (BELL, J.), so far as the same was excepted to, was as follows:—

"The defendants rely upon the statute of limitations, as a complete bar to the plaintiffs' claim. This, in my opinion, is the true battle-ground of the case, and deserves to be critically scanned and deliberately examined by you.

"The act of 28th March, 1785, declares that 'no person or persons shall make entry into any manors, lands, tenements, or hereditaments, after the expiration of twenty-one years after his, her, or their right or title to the same first descended or accrued'— that is, a true owner of lands and tenements who suffers another to enter upon his property adversely to him, and continue such hostile possession undisturbed for the period of twenty-one years, shall not afterwards be permitte d to call in question the right of the trespasser or to assert his own. A hostile, undisturbed possession of land by one who may have been originally a trespasser, for the space of twenty-one years, confers a complete title in law, sufficient not only to enable the party to defend in an action brought by the original owner, but to sustain an action brought by the disseisor to recover the possession.

"But to give to a possession of twenty-one years this effect, it must be actual, open, notorious, visible, distinct, continued, and adverse or hostile to the title of the true owner. If it lack any of these qualities, it will not bar the true title. It must be actual, open, and notorious; that is, not constructive, secret, or concealed: it must be visible—capable of being observed—distinct—not in common. It must be continued for the required period—not broken or interrupted. It must be plainly adverse and hostile to the true title, and not subservient to it. He who sets up the bar of the statute, must make out all these features; and if he fail in any of them, his right to retain possession also fails; but more particularly he must make out the latter quality, to wit, the hostile character of the possession; otherwise it is presumed to be in subordination of the true title, and subject to the will of the owner.

"Now, had the defendants, or those under whom they claim,

this kind of possession for twenty-one years? If so, their title is perfect, and sufficient to protect them in this action, though you should be of opinion Sailor's title was originally the first and best, under the principles I have laid down. I have said they and those under whom they claim; for each succeeding owner or tenant, the one claiming under the other by connected links, is entitled to the benefit of the possession of his predecessor. But if, at any time, the possession be interrupted before the twenty-one years have run, a subsequent occupant cannot avail himself of the prior possession; as, for instance, if one having the possession abandons it, or is ousted, and a vacancy occurs, and then another enters, not connected with or claiming under him who abandoned the possession or was ousted from it, the last possessor cannot draw to himself the prior possession, and by connecting it with his own, make out a title in himself, by virtue of the bar furnished by the statute of limitations.

"But this principle does not apply to a temporary vacancy of actual possession, while the landlord or owner may be waiting a tenant, or where the tenants have been driven out by stress of sickness and contagious disease, and possession is subsequently resumed when the danger has passed.

"When inquiring whether the defendants and those under whom they claim, have had the kind of possession I have indicated, you will bear in mind the legal presumption that the possession accompanied the legal title, until the contrary be shown.

"If Sailor had the prior title, as it seems to me cannot be successfully disputed, then it is to be presumed possession accompanied his deed, from the time of its delivery, and it lies on the defendant to show, by distinct and satisfactory proof, either that Sailor never had possession, or that, having it, it was subsequently divested by a hostile entry on their part. This must not be left to merely unauthorized inference, but ought to be shown either by direct proof or such circumstances as satisfy the inquirer of the fact.

"I am now starting with the legal presumption in favour of the first title, without taking into consideration the proof the plaintiff has offered you of an actual possession by his grantor, which will be more conveniently brought into view, when treating of another part of the defence.

"Have the defendants satisfied you either that Sailor never had possession of the premises, or that if he had, he was dispossessed by their predecessors with hostile intent?

2 C

"This is a question of fact for your consideration and decision, but I am bound to say to you that, in my opinion, they have furnished powerfully convincing, if not conclusive proof, considered by itself and without reference to the plaintiff's proof, either that Sailor never had possession, or that it was not long after he procured his title, *invaded* by those under whom the defendants claim to hold.

"The first portion of the evidence to which it is natural to turn, are the deeds and muniments of paper title which have been read to you on the part of the defendants. [Here the court referred to the deeds.]

"Unless Sailor was, at the time of the inception of this title, by himself or tenants in actual possession of the premises, the presumption is, that possession was taken in pursuance of the title shown by the defendants.

"It is said the claim of title is imperfect, from the fact that the executor of John Peters, who undertook to sell and convey to Joseph Peters, had no power to do so, and therefore their deed conveys no title.

"If the defendants were the parties out of possession, and plaintiffs in this action, seeking to recover possession by force of their paper title alone, there would be something in the objection; but in the aspect of the case in which I am now considering this title : to wit, as evidencing possession against Sailor, this is a matter of no consequence.

"It has been suggested at the bar, that this attempt to convey the premises by the executors, was such a fraud on Jacob Sailor, as will, in some way, prevent the bar of the statute running against him. But I do not see any force in this suggestion. The deed was evidently made in mistake of the power given by the will of John Peters; otherwise the property would have been conveyed by the heirs or devisees of the testator. I think you may, without impropriety, throw this suggestion of fraud aside. Now, was there, at any time, an actual entry upon these premises, in pursuance of this *colourable* title, considering it as *colourable* only? I have already said that a trespasser entering is presumed to enter in subordination to the true title, unless he in some way manifests a hostile intent.

"But where a party enters, claiming under a colourable title, conflicting with the true, there is no room for this presumption. The entry is necessarily *adverse* and *hostile*.

"In aid of the presumption of entry and possession, under the

younger deeds, in the absence of proof of an actual possession by Sailor, it may be mentioned that, although a deed was made to Sailor in the year 1788, the property does not appear to have been assessed in his name. Upon this part of the case, a learned judge, who has had occasion to review the facts, made this remark : 'Had he (Sailor) taken the actual possession of it, either by himself or his tenants, immediately, or shortly after, and kept it even for the space of two or three years, it might naturally be supposed that the assessor would have come to a knowledge of it, and, of course, as was his duty, would have made a return of it in Sailor's name, accordingly ; nothing, however, of the kind appears.'

" But, as I have said, the defendants, as was their duty, while standing on the statute of limitations, have furnished you with strong proof of an actual entry and possession under what I have called the *colourable* title derived from Henderson. I have already referred to their deeds.

" The next piece of evidence which I may recall to your recollection, is the *scire facias sur judgment* recovered against Weiss in 1786, sued out against Etwein in 1789, as is averred. It is said the *sci. fa.* was against Etwein as *terre tenant* of this land.

" To show this, a recorder's certificate has been read, showing there was no conveyance to Etwein between 1787 and July, 1789, except from Henderson and wife, for the bake-house, February 2, 1789.

" It is supposed this *sci. fa.* issued against Etwein on the idea that after-acquired estate by Weiss was bound by the prior judgment.

" In this *sci. fa.* Etwein comes in and defends as *terre tenant.* If it was of this land, you may accept it as proof of possession in Etwein, in pursuance of the deed to him, February, 1789.

" But the lot and bake-house were conveyed by Etwein to John Peters, on the 16th of February, 1789. By the books of assessment of this county, it is shown this property was assessed in the name of Jacob Peters (baker), first in the year 1791, and continued to be so assessed down to the year 1793, and after. According to the testimony of John U. Frailey, this Jacob Peters was a son of John Peters, whom he first knew in possession of the property, after old Michael Sager, and prior to 1793, having died in that year of the fever.

" It is submitted to you, that here is strong evidence, that, at least as early as 1791, the Peters family had actual possession of the premises, by virtue of the deed to their father, John Peters. If

this be so, I repeat, it was *primâ facie* a possession hostile to the title of Jacob Sailor.

"If, for the present, this be so accepted, the next question is, was this possession continued by them and their alienees, uninterruptedly, for twenty-one years.

"It would seem that John Peters, the father, also died in the year 1793; for it appears his will was proved on the 18th of October, 1793.

"In 1794, the property was assessed as Jacob Peters' estate, and continued to be so until 1798, when it was assessed as the estate of George Peters, one of the sons of John Peters, and one of the executors nominated in his will. In 1799, it is assessed as an empty house and bake-house, for George Peters' estate.

"In 1801, as an empty bake-house and lot—George Peters.

"In 1802, in name of Daniel Ley, as occupant of George Peters' estate, and as a sugar-house. It continued to be assessed in this way, and in name of Ley & Hupfeldt, until 1808, when the name of Joseph Peters was introduced. But the conveyance of the executors to Joseph Peters was in 1800.

"In 1810, it is assessed as the estate of Daniel Ley. Joseph Peters conveyed to Daniel Ley, 29th November, 1809. It continues to be thus assessed until the year 1820, when it is returned as the property of Peter Hertzogg. The assessment for 1819 has not been given.

"On the 3d February, 1818, Daniel Ley conveyed to Charles Hupfeldt and others, assignees for creditors, and on the 26th June, 1818, Hupfeldt and others conveyed to Peter Hertzogg and Tobias Behler. This last deed was recorded 22d April, 1819. In 1820, it was assessed as Peter Hertzogg's estate. In 1822, it is returned as estate of Peter Hertzogg & Co., and this continues down to 1828, when it is assessed as belonging to George S. Guyer, and so continues down to 1831, the year when this suit is brought.

"Now it is true, that the assessment of a vacant lot or piece of ground in the name of a particular individual without title, and even the payment of taxes by him, is not of itself evidence of such actual adverse possession in the party, as will enable him to set up the statute of limitations. Yet when there is a title, though it may be an imperfect and impeachable one, and proof of actual possession of the premises, for a portion of the time requisite to create a right, by those in whose names the property has been assessed for a number of years, the jury may look to such assessments as affording evidence, and in many cases strong, if not entirely satis-

factory evidence, of a continuing possession, and of the claim made by such persons. I do not therefore agree with the learned judge who first tried the cause on this point.

"I have already called your attention to the testimony of Mr. Frailey, who fixes the possession in Jacob Peters, son of John, prior to 1793.

"John Greiner swore he knew the property for fifty years prior to 1827 (1777.) He thinks John Peters was in possession in 1794 or 1795, when his son Jacob succeeded him. In the date the witness must be mistaken, for it is proved that both the father and son Jacob died in 1793. But he proves two important facts, to wit, the actual possession of *John* and the succession of *Jacob*. He further says, Jacob carried on there till Ley came there, but I think he is in this also mistaken.

"Conrad Wile has known the premises many years. Moved opposite to it in 1793, when the Peters family were in possession. Knew it before this, when the Peters family were in possession. Jacob died of the fever in one of the houses adjoining. After his death, Stammers, who was a baker, occupied it. He don't know how long he continued there; but witness left him there in 1798, when he moved from the alley.

"This agrees with assessments that have been read; 1798 was the year of the fever, when all fled who could, and the next year the bake-house appears to have been empty, and so returned by the assessors.

"John Maybin, who was son-in-law of John Peters, and one of his executors, testifies he cannot tell what year the Peters family came into possession, but they were in possession in 1793. Don't know how long they continued to possess *it, but did so down to the executors' sale, which was in* 1800.

"But Greiner says, he thinks it was vacant previous to 1793, when it was pelted with stones as a haunted house.

"How long this was before 1793, and whether before the deed to John Peters in 1789, does not appear. This witness also says, he thinks it was untenanted after the death of Jacob Peters and before its occupancy by Ley.

"This testimony accords with what we find in the assessment books. It appears to have been untenanted in the years 1799, 1800, 1801, but was still assessed as the estate of George Peters.

"In reference to the suspension of the actual occupancy, you will bear in mind what I have already said on the subject of a temporary vacancy for want of a tenant or from other temporary

cause; and that to break the continuity of an adverse possession, there must be abandonment of the possession, or the entry of some other claiming for himself.

"You will say what was the reason and character of the vacancy of possession here proved, but it is submitted to you upon all the proof in the cause thus far considered, there was no abandonment of the possession by the then claimants, the Peters, and there is no evidence of the entry of any other person, claiming independently in the years 1799, 1800, 1801, for it continues to be assessed in those years, as the property of George Peters.

"This brings us down to the year 1802.

"By the testimony of John Patterson and Edward Pennington, Ley took possession at this time. Pennington says he thinks it was in 1801, but most likely he was mistaken in this. Patterson purchased sugar from him in 1802. This is corroborated by all the other evidence, so as to leave it beyond question, that in 1802, Ley was in possession.

"Now in what character did Ley take possession: claiming under the Peters family, or as asserting an independent possession? This is an important inquiry, but I think it is not difficult to answer.

"John Maybin said Ley rented it of George Peters before he (Ley) purchased; but he gives as a reason for so saying, that Ley must have paid rent, because he was in the property some time before he bought. He did not see any rent paid, or know actually as to the tenancy.

"But if the occupancy of Ley, and of Ley & Hupfeldt from 1802 to 1809, be connected with the assessments, I think but little doubt can be entertained that up to the time of the conveyance to Ley by Joseph Peters, in November 1809, the former occupied it as tenant of the Peters. This becomes almost certain, when you recollect the conveyance to Joseph Peters in 1800, by the executors who lived in the neighbourhood. Of the subsequent possession by Ley, Peter Hertzogg, and George S. Guyer, down to 1831, when this suit was brought, you have full proof.

"Upon this evidence are you satisfied there was a continuing possession by the various persons claiming under the same title, colourable or otherwise, and asserting the same right? If so, it was beyond doubt, an open, notorious, visible, distinct and hostile or adverse possession, so far as the present plaintiff is concerned, sufficient to satisfy the rule deduced from the statute of limitations.

"If it were so continuing and hostile, when did it commence?

" I have already spoken of the presumption of possession from 24th Nov. 1789, the date when the deed of Henderson to Etwein was acknowledged, provided there was no possession in Sailor. I have also adverted to the evidence of actual possession in Etwein.

" But, passing by these two periods, at which times you may not be satisfied to find an actual adverse possession against the plaintiff's grantor, we arrive at the date of the first assessment in 1791, in the name of Jacob Peters, (baker.)

" I have before submitted to you that there is strong evidence the Peters family were in actual possession of these premises in 1791, provided you believe the assessments relate to the identical premises in dispute.

" But, passing this by, for it is not necessary the defendants should insist upon it, it is, I think, beyond dispute that there was a possession prior to 1793. Counting from this to the next most important *era* in the cause, to wit, the year 1815, there was more than twenty-one years. If this possession was adverse, it is sufficient to confer a title upon the defendants, upon the security of which they are entitled to stand.

" But to meet and rebut this part of the defendants' defence, the plaintiff has offered evidence for your consideration, that whoever may have been in possession of the premises in 1793 and 1797, it was held by them in subordination to and acknowledgment of the title of Jacob Sailor.

" If this be so, it follows, of course, the possession of 1793 and down to 1797, was not adverse to, but entirely consistent with the plaintiff's title.

" The only proof in support of this part of the plaintiff's case, comes from the mouth of Catherine Craigean, a sister of Jacob Sailor.

" She says that Frederick Gash, her then husband, received rent for Jacob Sailor and sent it into the country. The year before 1798, according to her recollection, was the last time he received rent. Other statements, under oath, of this transaction and of the interview with Ley, were made by the witness in 1825 and 1827.

" In these different statements, there are, certainly, discoverable some startling discrepancies.

" As the most satisfactory mode of pointing them out, I will adopt the review of a learned and accurate judge, who has had occasion to collate these different statements."

[Here the judge read from the opinion of Judge Kennedy,

reported in 4 Whart. 281, and the subsequent pages relating to this evidence.]

"But it is your duty to reconcile these apparent discrepancies, if you can, so as not to impute perjury to any one. If, upon supposition of a failure of recollection at one time, and a more perfect memory at another, you are satisfied of the correctness of any of these statements, of course you will adopt that which you are satisfied relates the actual facts. But if from these contradictions you cannot safely entertain either, you may reject all.

".The evidence I have been considering is chiefly important in reference to the transactions of 1815, testified to by Young, and perhaps by Kolbach.

"It is so in this point of view. If in truth no such rent was received by Gash, on account of Sailor, in 1797 and the preceding years, then the conversations and transactions of 1815 are of no manner of consequence; for it is a rule, which the safety and security of titles requires us to adhere strictly to, that where the statute of limitations has closed upon the title—that is, where twenty-one years' adverse possession has run—nothing less than a legal or equitable title, acquired by contract, will divest the statutory title, acquired by the lapse of time. It is not pretended, nor can it be, that there was any such *contract* between Ley and Sailor in 1815, as created a title, legal or equitable, in the latter. If, therefore, you disbelieve the testimony of Catherine Craigean, there is an end of the plaintiff's case; for, more than twenty-one years having elapsed between 1792 or 1793 and 1815, the statute of limitations had closed on the title, and shuts out the plaintiff, notwithstanding the conversations proved by Young, Kolbach, and Craigean.

"But, if you believe the testimony of Catherine Craigean, that rent was paid by the occupants of the bake-house, to Jacob Sailor, down to 1797, then another important question is presented for your consideration and determination.

"It arises in this way. From 1797 to 1815 is not a period of twenty-one years. But from the former date to the time of the inception of this action in 1831, more than the required number of years had run; and it follows, this possession being such as is required by the statute, the plaintiff's claim is barred, unless he has shown you that something happened in the mean time, which interrupted the running of the statute. This, he avers, actually did take place, and he points us to the transactions of 1815, as sufficient to prevent the bar of the statute.

"This is the second branch of his defence, resting for its suf-

ficiency, in the first place, on the truth of Catherine Craigean's evidence.

" Supposing this to be true, then we are to consider whether the conversations of 1815 will avail the plaintiff to rid himself of the limitation upon which the defendants rely.

" I have already said, that if the statute had run against the plaintiff's title in 1815, nothing then took place which will help him, for there was no contract.

" But if the statute was only running to its consummation, and not actually complete, then a different rule prevails.    It is this:— If, at any time during the running of the statute, the party in possession *intends* to occupy the land subject to the *will* of the true owner, and in subordination to his title, and not adversely to him, and this be made to appear clearly by the evidence, the statute of limitations will form no bar to the owner's recovery of the possession, whenever he may demand it.    In such case a contract such as would create a new title in the original owner is not required, for the obvious reason that there is yet no adverse title in the actual occupant, which he can convey to him who has the prior valid title.

" Now an intention to hold, subject to the will of the owner, may be shown by the declarations of the occupant, and if by such declarations the latter deludes the owner into the belief that he does not intend to hold adversely, but subject to the legal title, whereby the owner is prevented from insisting upon the possession, but suffers the occupant to retain it until after the lapse of twenty-one years, the law will not permit the occupant to set up the statute in bar, for this would be a fraud.

" To bring himself within the operation of the rule I have stated, in answer to a call made by the defendants, the plaintiff offered to prove, that 'Daniel Ley, under whom the defendants claim, clearly, absolutely, unquestionably, and unconditionally, acknowledged the title of Jacob Sailor, under whom the plaintiff claims, and agreed either to purchase or rent the premises from Jacob Sailor; admitted that he had no title to the premises himself, and that Sailor had the true title, and declared in effect, that he intended no longer to hold adversely to him, and that his declarations and admissions were such as to induce Sailor to believe that he would in future hold under him.'

" Has the plaintiff succeeded in satisfying you that such is the fact ?

" When considering your answer to this question, you will carry

along with you the principle, that no mere offer to compromise a disputed title or claim, or to purchase a title set up as superior to the title under which the occupant claims, can be considered as a declaration of intention to hold in future subject to such title. Every one in danger of litigation, has a right to buy his peace, and no offer to do so, unexecuted or carried into effect, ought to be permitted to affect the rights of the party making the offer; and it makes no odds that the offer was made under an opinion, mistaken or true, that the title which it was proposed to compromise, is the better title.

"To prevent the running of the statute, there must be either a distinct recognition of the title set up, and a declaration, express or to be implied, of an intention to hold under it in future, or such insincere professions of submission and illusory proposals to purchase, as fraudulently induce the owner to lie by inactive, until the statute has run.

"Now what was the character of the communications which took place in 1815?

"The witness mainly relied on, to establish this part of the plaintiff's case, is Isaac Young. [Here the judge read his testimony.]

"This testimony is sought to be corroborated by the evidence of Catherine Craigean, [which was read.]

"I have already had occasion to speak of the testimony of this witness, and will not trouble you with a repetition.

"The only other witness to this point, is Henry Kolbach, [which was read.]

"The testimony of this witness is impeached by proof of his bad character; and upon this proof the jury will be fully justified in refusing to give it credence.

"But perhaps this will not be found necessary; for it appears to me he proves nothing beyond an offer or effort to compromise a claim set up against the title, under which Ley undoubtedly claimed up to that time.

"Do Young and Craigean prove anything beyond this?

"This is a question for you to settle, but it is my duty to say to you that, after mature consideration of the evidence, I entirely agree with the learned judge, to whom I have more than once alluded, as having reviewed this testimony, that there is nothing in it to show an understanding between the parties, that Ley was to hold under Sailor and as his tenant.

"But if this be otherwise, in your apprehension, there are

certain discrepancies in this evidence worthy your notice, which have been reviewed by the judge, to whose labours I am already indebted, and to which I again advert. [Here the judge again read from the opinion of Judge Kennedy, commenting upon Young's testimony. Reported 4 Whart. 286.]

"If, then, you disbelieve that rent was paid to Sailor after 1793; *or* believe the transaction of 1815 was a mere negotiation for compromise, which failed of effect, there is evidence of such an adverse possession in the defendants, and those under whom they claim, for twenty-one years, as I think, calls for a verdict in their favour.

"But if, upon the evidence, you believe the occupants of these premises paid rent for them to Jacob Sailor down to 1797, *and* that in 1815, Daniel Ley recognised Sailor's title, and professed an intent to hold subject to it thereafter, which led Sailor to believe he would do so, then there is no room for the operation of the statute, and that part of the defence founded upon it fails.

"But, of both these positions you ought to be fully satisfied on the evidence, before you consent to establish them to the defeat of the defendants."

The errors assigned were:—I. The admission in evidence of the deeds under which the defendants claimed title. II. The admission of assessments in the names of other persons than John Peters. III. The admission of the record of Murgatroyd *v.* Etwein. IV. In the charge:—1. In relation to the deed by the executors of John Peters. 2. In reference to the assessment books. 3. In saying, if the testimony of Catherine Craigean was not believed, there was an end to the plaintiff's case, &c. 4. In reference to Kolbach's testimony. 5. In the instruction, in case the jury disbelieved that rent was paid to Sailor after 1793, or believed the transaction in 1815 was a mere negotiation for a compromise, the defendant was entitled to a verdict. 6. In instructing the jury in effect, that the supposed discrepancies in the testimony of Young and Craigean rendered their testimony of no effect in establishing one of the most material points in the case; and in reading to the jury, and adopting as part of the charge, the opinion of Kennedy, J., in Sailor *v.* Hertzogg, 4 Whart. 7. In the instruction, in substance, that the declarations of Ley, as proved by Young, Craigean, and Kolbach, were not sufficient to justify an inference that he intended no longer to hold adversely to Sailor. 8. In instructing the jury contrary to the true spirit of the case of Sailor *v.*

Hertzogg, 2 Barr, and in effect withdrawing from the jury the consideration of the material facts of the case.

*H. Hubbell* and *Rawle*, for the plaintiff in error.—Possession, to bar the right, must be continued and unbroken: 4 Whart. 269. This may be by persons having the right of a former possessor; but one not lawfully holding that right cannot use the former occupancy to make up the term. Hence, the conveyance by the executors of John Peters was not evidence, for want of proof of a right to convey to Joseph Peters. And it is not pretended that he had actual possession: hence the subsequent deeds, which depended on his title, were irrelevant. The assessments were only evidence of a claim to possession by the party in whose name the property stood. It never was assessed in the name of John Peters, and cannot be used as evidence of either possession or a claim by him: 4 Wh. 271. The record of the *sci. fa.* was no evidence of Etwein's possession; for, beside the want of proof of the identity of the land, the earliest date in the record was subsequent to his conveyance to Peters. The charge was erroneous on the subject of the assessments; they were declared to be of little weight in 4 Whart. 271–8. And they are not evidence of possession, but at most of claim: 4 Wh. 291; 2 W. & S. 240; 10 W. 141; 5 Barr, 294. They were admitted as evidence of claim only, and yet, in the charge, treated as evidence of possession. If so, they should have been so admitted, when the plaintiff might have rebutted the proof. Here there was no evidence of payment of the taxes. It is submitted, that they are evidence only in the case of unimproved land in the country. Their notorious inaccuracy would render it highly dangerous to admit them for the purposes contended for. The facts were withdrawn from the jury, and a binding opinion expressed in favour of the defendants; and yet this same evidence was so far from conclusive, that a motion for a new trial on that ground was not allowed to be argued: 4 Whart. 273. The recognition of the title was such as suspended the running of the statute, as was decided in 2 Barr 182; 5 W. 348.

*C. Ingersoll*, contrà.

BELL, J.—The zeal, naturally enough elicited by a protracted contest, with which this cause was argued for the plaintiff, induced us to examine, with more than ordinary care, the exceptions taken on the trial. This review has but served to strengthen our primary impressions that the assignments of error are destitute of merit.

After the long litigation the case has undergone, and the many opportunities thus afforded to ascertain the principles by which it must be ruled, it is somewhat curious room should have been found for the suggestion of so many supposed errors as load this record. The repeated explorations of the ground of controversy, both at Nisi Prius and in banc, ought to have made it familiar; and if the judge, before whom it was last tried, failed to comprehend it, the failure ought not, certainly, to be attributed to the want of light shed by former inquiries, or to any difficulty inherent in the subject. A brief examination, however, will make it apparent that, in conducting the investigation, he has but followed the well-marked path of those who preceded him.

The first assignment of error and the first specification of the fourth are kindred, and will, therefore, be treated together. They rest in a supposed want of power in the executors of John Peters' will to make sale and conveyance of the premises in dispute. There is no copy, or even abstract, of that will on the paper-book, and its provisions are not now recollected. In the first report of this case, (4 Wh. 261,) it is stated the will confers upon the executors the requisite authority; and the judge who, on that occasion, delivered the opinion of this court, evidently so thought. But taking the fact to be as now stated, the conveyance made by the executors, and the subsequent dependent muniments of title, were properly admitted in evidence, not as showing a perfect title, but as indicating by what colour those who claimed adversely to the plaintiff's pretensions, justified their entry upon and after possession of the land. These instruments were not necessary to perfect a title under the. statute of limitations. This might have been established without them. But they were highly important, as showing the character of that possession—of which much independent proof had been given—both in its inception and continuance through a period of more than half a century. Proof had been put in which I think must have convinced the jury, and, I may add, was entirely satisfactory to me, that, before the conveyance by Etwein to John Peters, in 1789, the latter was in possession of the premises, or that he entered shortly afterwards, and, by his son and other tenants, continued to hold down to the period of his death, after which the possession was continued by the family until the conveyance by Joseph Peters to Daniel Ley, in 1809, from whence it was preserved unbroken, by the several alienees, to this moment. Under this state of facts, the executors' deed, in connexion with the prior and posterior conveyances, was evidence of weight in a two-fold aspect:

as showing in whose right the sons claimed the possession, proved to have been in them; and, secondly, as already observed, manifesting the character of that possession. For both these purposes, and more especially for the latter, scarcely anything could be more potent. In commenting upon similar proof, it was said in Dikeman v. Parrish, 6 Barr, 225 : "Of the facts that have been recognised as indicative of hostile intent, none is, perhaps, more decisive than the exhibition of a paper title, independent of that residing in the original owner, by colour of which the party justifies the original entry." Striking out, then, the disputed conveyance, as a link in a perfect chain of paper title, the observation now objected to, that, as evidencing possession against Sailor, it was of no consequence whether the deed was made in pursuance of a power given by the will or not, is perfectly correct. It is very true, as the plaintiff insists, that to constitute a title by possession, it must be continued and unbroken for twenty-one years. But the rule does not also call for a continued and unbroken succession of perfect conveyances running along with the possession; yet this is what the argument would seem to demand. Every one knows that continuity of holding is enough, if it be adverse. This is shown by a continuity of claim; and continuity of claim may be demonstrated by written instruments, radically defective as conveyances.

Before leaving this point, it may be well enough to say, it is by no means certain the executors' deed is incapable of being supported as a valid conveyance. At this day, the heirs of John Peters would be estopped to deny its validity, more especially if they received the proceeds of sale, which, I think, would now be presumed : Adlum v. Yard, 1 R. 163; Hays v. Heidelberg, 9 Barr, 203. If sufficient against them, could it be impeached, for want of power residing in the executors to make it, by the plaintiff, who claims under a distinct title ?

The second assignment, and the second specification of the fourth, are intimately connected with the points just discussed. They also invite a joint consideration. To an estimate of their value, a glance at the evidence put in before the introduction of the assessment books, is necessary. The defendant began by exhibiting a succession of regular conveyances, with the exception of the deed made by the executors—if, indeed, that is to be excepted—commencing in 1788, and thence down, through William Henderson, the acknowledged owner of the property, to the last deed, made in 1827. He also showed two mortgages of the premises, one executed in 1809, by Daniel Ley, the grantor of Joseph Peters, to the

latter; the other, in 1846, by the same mortgagor, to Thomas S. Fuldt and John- Snyder. These were followed by proof of an almost uninterrupted corresponding possession from 1789, and perhaps before, until the trial of this cause, in 1847. I say a corresponding possession, for, notwithstanding the criticism to which this portion of the defendant's case has been subjected, it is impossible to scan the testimony, with an unprejudiced eye, without being satisfied that, after the conveyance to John Peters, he, in person, or by his son Jacob, held the premises, claiming under that conveyance, until 1793, when they both died of yellow fever; and that after this, it continued to be held by the Peters family, as their patrimony, up to 1800, when it was conveyed by the executors of the father to Joseph Peters, one of the sons, who claimed to own it until he aliened it to Daniel Ley, in 1809. But, during portions of this interval, the *pedis possessio* was sometimes in strangers to the family, and sometimes, for short periods, the bake-house was unoccupied. The latter was the case in 1794, after the death of Jacob Peters, and again in 1799, the pestilence having, a second time, scourged the city in the preceding year, when many fled from their homes. Some evidence was given to show that the stranger occupants entered under the Peters family, who continued to assert their estate at all times, including the periods of vacancy. In support of this, and as corroborating the other proofs of possession, the assessments were introduced. An examination of them, in connexion with the facts to which I have adverted, will show they were highly satisfactory for such a purpose. It is not now necessary to run over them, since this was done at Nisi Prius. But it may not be unprofitable to note that, after the death of Jacob Peters, the property was assessed in the name of George Peters, the acting executor, until 1808, when it was rated as the estate of Joseph Peters, to whom the executors had before conveyed it, by a deed dated in 1800, though not acknowledged or recorded until 1804. Afterwards it was returned as Joseph Peters' estate, until 1810, when Daniel Ley's name was introduced as owner, and who, in fact, became so in the preceding year, by a conveyance from Joseph Peters. Since then it has uninterruptedly continued to be assessed in the names of the parties holding by title derived through the Peters family.

In view of this connected series of facts, the jury was told that, although " the assessment of a vacant lot or piece of ground, in the name of a particular individual without title, and even the payment of taxes by him, is not, of itself, evidence of such actual

adverse possession in the party, as will enable him to set up the statute of limitations; yet, when there is a title, though it may be an imperfect and impeachable one, and proof of actual possession of the premises, for a portion of the time requisite to create a right, by those in whose names the property has been assessed for a number of years, the jury may look to such assessments as affording evidence, and, in many cases, strong, if not entirely satisfactory evidence, of a continuing possession, and of the claim made by such persons." In this instruction, it is not perceived a mistake was committed. True, it has been determined the assessment of a vacant lot in the name of one without title, and payment of taxes by him, cannot, by construction, be magnified into a hostile possession under the statute, for that must be actual and notorious: Naglee v. Albright, 4 Wh. 291. So, on the other hand, non-payment of taxes by an actual adverse holder, will not destroy his statutory title when once acquired: Hockenbury v. Snyder, 2 W. & S. 240. And the better opinion is, that payment of taxes assessed on a wild and unseated tract of land, though in the name of the payer, is only evidence of claim of title, but is not to be esteemed equivalent to possession, when the party never entered at all, though a contrary doctrine seems to have been recognised, to some extent at least, in Kelsey v. Murray, 9 W. 111. This case is, perhaps, to be regarded as an exception, under peculiar circumstances; for, doubtless, the general rule is as I have just stated. But it is confined in its operation to unseated tracts. In other cases, assessment and payment of taxes, is frequently received as evidence of ouster and exclusive possession. For instance, though a settler on appropriated land may not be an avowed intruder, his possession extends no further than his original occupancy, because there is nothing else to mark its extent. But payment of taxes by him, raises a presumption of ouster of the whole tract, and extends, by construction, his adverse possession to the boundaries of the survey: Royer v. Benlow, 10 S. & R. 306; McCall v. Neeley, 3 W. 69. And this obtains, though the actual occupancy continues to be but of a small part of the whole; for, under such circumstances, payment of tax gives colour of title to the whole, and is tantamount to adverse possession to that extent, which, if continued long enough, creates an indefeasible title: Naglee v. Albright, *suprà*; McCaffrey v. Fisher, 4 W. & S. 182; Kite v. Brown, 5 Barr, 291. It is thus seen, that assessment may be called in aid of a title, having its inception in hostile intention, upon the ground that when connected with even a restricted and imperfect possession, it works a con-

structive ouster. If this be so in the case of uncultivated lands, in a secluded district, surely, when the subject of the statute is a habitable structure, in the heart of a populous city, an assessment for forty years, consistent with a written title and an almost uninterrupted actual possession, may be referred to as powerful proof of continuing possession during a doubtful period, or to assist in determining the relations of a stranger, who appears on the scene as temporary occupant; and as generally corroborative of the whole case. In truth, such assessments may, without breach of legal propriety, be received as in some sort an official ascertainment of actual occupants and owners, by officers appointed for the very purpose. That it was so regarded by this court, when the case was here for the first time, is pretty evident from the laboriously prepared opinion then delivered: 4 Wh. 279. Nor do I perceive that, in according to it this degree of credit, we hazard so much of error as the plaintiff's counsel seem to apprehend. Mistakes in naming the owners of unseated lands may, and frequently do occur, especially where they are, as is very common, non-resident and unknown. But this can rarely happen in a dense community, when the object of the assessment is a dwelling, or place of business; and should it, it is scarcely possible the blunder would be persisted in through a series of years. To say that it is possible, is to say nothing to the purpose; for all human testimony may be infected with error, but we dare not, for that reason, entirely reject it.

It will be perceived that, in the discussion, I have treated these assessments as though accompanied by proof of payment. It is stated that no book is kept in the commissioners' office, showing the taxes paid. No better public evidence than the assessments was behind. Even in the case of unseated lands, it is, therefore, the practice to show the assessments merely: Kelsey v. Murray, 9 W. 112. And after the lapse of years, the taxes are presumed to be paid. A fortiori it is so, where the subject of the tax is habitable property.

The plaintiff, however, insists that, admitting the correctness of what has been said, a wrong was done to him by putting these assessments to the jury as evidence of adverse possession, when, in truth, they were received simply as evidence of claim. It is difficult, in such a case as this, to distinguish clearly between an adverse claim and an adverse possession, since the one was accompanied by the other. But the objection is founded in misapprehension. The judge, on the receipt of the evidence, said nothing more than that the assessments of themselves were not evidence of

adverse possession. The guarded character of the remark suffi-
ciently shows he did not mean to intimate that, in connexion with
the other proofs, they might not become so. His remark was cer-
tainly not so intended, nor can we think it was so accepted at the
moment. He feels very confident no injustice was done to the
plaintiff on this score, for full opportunity was afforded to combat
the inferences deducible from the assessments, and there is no such
apparent error in the record, in this particular, as will justify a
reversal of the judgment.

The record of the action, Rundle v. Etwein, we think could not
properly have been kept from the jury. At that day the question,
whether after-acquired land was bound by the lien of a prior
judgment, was unsettled, as appears by the report of the case
against Etwein, appended in a note to Calhoun v. Snyder, 6 B. 136.
The object of the *scire facias* was to try that question as against
"a messuage and lot of ground in the city of Philadelphia,"
acquired by George Weiss between December, 1786, the date of
the judgment, and the year 1789, when it is said to have been in
the seisin of Jacob Etwein. If this messuage and lot was that
now in question, it is not denied the record was evidence, as tend-
ing strongly to prove that the possession was, in 1789, consistent
with the defendant's title. Now, there was certainly some evidence
of identity for the consideration of the jury. It was shown that
Henderson had conveyed to Weiss in June, 1788; that the latter re-
conveyed to the former in January, 1789, who, in February of the
same year, aliened to Etwein. To this was added the recorder's
certificate, that, between the date of the judgment recovered
against Weiss and the 1st of July, 1789—a time subsequent to
Weiss's alienation of the property—no other messuage and lot was
recorded as being acquired by Etwein, save that here in contro-
versy. It must be confessed, the uncertainty as to the precise time
when the amicable action of *sci. fa.* was commenced, somewhat de-
tracts from the value of the record as an instrument of proof. The
formal writ, though bearing the test of September, 1790, was not
filed, and, by agreement, "made part of the record," until August,
1794; yet, it is obvious this was long after the inception of the
proceeding. The amicable action was entered as of June Term,
1789; it was first continued in December of that year, and was
removed into the Supreme Court in 1792, where it is entitled as of
December Term, in that year. It is probable the form of the writ
was placed of record to cure some technical objection; for this was
long after the action instituted; which, it is possible, originated in

an agreement to try the question in this way, before Etwein aliened the land to Peters, on the 16th of February, 1789. At all events, in the absence of the slightest evidence, leading even to the suspicion of another conveyance of similar property to Etwein, about that period—of which it is natural to think some proof could have been given, had such existed—the difficulties originating in discrepance of date are insufficient altogether to invalidate the record as evidence.

The third specification under the fourth error, is grounded upon an isolated portion of the charge, separated from the context, and presented without reference to repeated cautions addressed to the jury, that upon them must devolve the responsibility of determining questions of fact, and particularly the question of the disputed possession. The sentence complained of, presented a proposition founded on mere lapse of time; the character of the possession having been before discussed and referred to the jury, as peculiarly within their province. No attempt was made to usurp this province, nor any approach made to a binding direction in reference to it. I think a candid perusal of the instructions given, will make this manifest.

The fourth, fifth, and sixth specifications of this assignment, may be very briefly disposed of. It is apparent the court below entertained a very decided opinion as to the preponderance of the evidence, and the legal tendency of the facts proved. But though expression was given to this opinion, the plaintiff has failed to show that any controverted fact was withdrawn from the jury. These judges of fact were, I may venture to say, fully informed of their rights and duties, and the responsibility attendant upon each, more than once pressed upon their attention. The credibility of the witnesses was frankly left to them, though accompanied by the remarks of a very accurate judge, made when delivering the opinion of this court, and adopted by the presiding judge, as expressive of his own sentiments. This it was his right to do; were those sentiments erroneous, it would afford no ground for a reversal. But a careful re-examination satisfies me they are well founded, and such is the conclusion of a majority of this court.

The seventh and eighth specifications do not complain that the rules governing this part of the plaintiff's case, were incorrectly laid down, or that the facts upon which they rest, were taken from the jury. The complaint is, that the judge, at Nisi Prius, declared his opinion of the transaction, relied on by the plaintiff, to be in accordance with that expressed by this court, sitting in error upon

this very point. The judgment delivered, when the case was here a second time, contains nothing in contradiction of this, as may be seen by consulting it, in 2 Barr, 182. It was unquestionably the right of the judge to give to the jury his opinion upon this subject. Nay, looking to the peculiar character of this inquiry, its complication of facts, and their intimate connexion with the legal principles by which their value was to be tested, he would, had he failed to do so, been derelict of duty, even though his impressions stood unsupported by the authority to which reference has been made.

The remarks made cover the whole case. They prove, I think, satisfactorily, that no error was committed on the trial. I may add, that I was entirely satisfied with the verdict, which, I believe, is in accordance with the opinion of almost all of the judges before whom the case has from time to time been tried. It ought to be matter for congratulation, that this long and expensive litigation at length approaches its end.

Judgment affirmed.